# In the United States Court of Federal Claims

No. 10-182
Filed: April 1, 2011
**TO BE PUBLISHED**

| | |
|---|---|
| ************************************** <br><br> BECKY ROBERTS, <br><br>  Plaintiff, <br><br> v. <br><br> THE UNITED STATES, <br><br>  Defendant. <br><br> ************************************** | Administrative Procedure Act, 5 U.S.C. §§ 702-706; <br> Correction of Military Records, 10 U.S.C. § 1552; <br> Department of Defense Directive 1350.2; <br> Judgment On The Administrative Record, RCFC 52.1; <br> Military Pay Act, 37 U.S.C. § 204; <br> Motion To Dismiss, RCFC 12(b)(1); <br> Office of Naval Intelligence Instruction 1610.2; <br> Transfer of an Action, 28 U.S.C. § 1631; <br> Tucker Act, 28 U.S.C. § 1491; <br> UNITED STATES CONSTITUTION amend. V; <br> Venue, 28 U.S.C. § 1391. |

**John B. Wells**, Law Office of John B. Wells, Slidell, Louisiana, Counsel for Plaintiff.

**David M. Hibey**, United States Department of Justice, Civil Division, Washington, D.C., Counsel for Defendant.

## MEMORANDUM OPINION AND FINAL ORDER

**BRADEN,** *Judge.*

## I.   RELEVANT FACTS.[1]

On January 22, 1996, the Office of Naval Intelligence ("ONI") issued ONI Instruction 1610.2 ("ONIINST 1610.2") to advise senior ONI Officers how to prepare Officer Fitness Reports for the ONI Officers that report to them.[2]  AR 92.  Officer Fitness Reports grade the performance of ONI officers, on a scale from 1 to 5, with 5 being the highest, in seven "performance trait categories": Professional Expertise; Command Or Organizational Climate/Equal Opportunity; Military Bearing/Character; Teamwork; Mission Accomplishment And Initiative; Leadership; and Tactical Performance.  AR 118-19.  The average grade of the

---

[1] The relevant facts were derived from the July 9, 2010 Administrative Record ("AR 1-868").

[2] The senior ONI Officers that prepare Officer Fitness Reports are referred to as "Reporting Seniors." AR 92.

"performance trait categories" determines an ONI Officer's "trait average." AR 96. Officer Fitness Reports are issued once per year, and whenever an ONI Officer's Reporting Senior changes. AR 98.

ONIINST 1610.2 requires that Officer Fitness Reports include one of five recommendations indicating readiness for promotion: "significant problems"; "progressing"; "promotable"; "must promote"; or "early promote." AR 95. ONIINST 1610.2 also requires that ONI Officers within the same rank and assigned to the same Reporting Senior must be considered as a group for the purpose of promotion recommendations, known as a "summary group." AR 96. No more than 20% of any "summary group" can receive a recommendation of "early promote." AR 95. Where the "summary group" is comprised of Lieutenants ("LT") or Lieutenant Commanders ("LCDR"), no more than 50% of the group may receive a "must promote" or "early promote" recommendation. AR 95.

In addition, ONIINST 1610.2 publishes a "baseline guide" for correlating "trait averages" with promotion recommendations. AR 96. From January 22, 1996 to September 19, 1997, ONI used the following "baseline guide":

    (1) Early Promote – 3.90 or above;
    (2) Must Promote – 3.50 to 3.89;
    (3) Promotable – 3.00 to 3.49.

AR 96.

If more than 20% of a "summary group" receives a "trait average" above the "baseline guide" for "early promote," only ONI Officers with a "trait average" in the top 20% of the "summary group" may receive a promotion recommendation of "early promote." AR 96. Likewise, if 50% or more of a "summary group" comprised of LTs or LCDRs receive a "trait average" above the "baseline guide" for "must promote," only those officers with a "trait average" in the top 50% of their "summary group" may receive a recommendation of "early promote" or "must promote." AR 96.

On February 16, 1996, LCDR Becky Roberts ("Plaintiff") reported to the ONI to assume the position of Military Intelligence Program Management Department Head ("MIPMDH"),[3] a position usually held by a Commander. AR 81. As the MIPMDH, LCDR Roberts was charged with upgrading the ONI intelligence training program, pursuant to directives issued by the Director of Naval Intelligence. AR 49. LCDR Roberts oversaw the completion of a cost-benefit analysis to determine the best ways to improve the training program courses, and organized and led a council to ensure that these new programs met required standards. AR 49.

On October 31, 1996, LCDR Roberts received her first Officer Fitness Report from Captain ("Capt.") J.R. Bentz, her Reporting Senior, in which she received a "trait average" of

---

[3] The MIPMDH provides community management, education, and training support to the ONI. AR 81. MIPMDH is an infrastructure position that does not involve intelligence gathering or analysis. AR 47.

4.17 and a recommendation of "must promote."  AR 81-82.  There were 13 officers in her "summary group."  AR 82.

On June 19, 1997, LCDR Roberts spoke with Capt. Bentz about an upcoming Officer Fitness Report, to be issued on June 30, 1997, prior to Capt. Bentz's retirement from the Navy. AR 47.  Capt. Bentz informed LCDR Roberts that she had received the same "trait average" as another officer, who had improved greatly over the last reporting period.  AR 47.  Capt. Bentz, however, admitted that he gave the other officer a higher promotion recommendation in recognition of that officer's improvement.  AR 47.  As a result, LCDR Roberts received a lower recommendation than the prior year, because no more than 50% of her "summary group" could receive a recommendation of "must promote" or "early promote."  AR 95.  In addition, Capt. Bentz reassured LCDR Roberts that a lower promotion recommendation following a higher prior recommendation on a single report would not be detrimental to a future promotion or send a message that her performance declined.  AR 48.  In fact, Capt. Bentz stated that if he believed that this single lower promotion recommendation would be detrimental to LCDR Roberts's future efforts to be promoted to Commander, he would have given her a higher recommendation. AR 48.  Capt. Bentz advised LCDR Roberts that another reason for her lower rating is that the Command Ranking Board, that makes recommendations to the Reporting Seniors regarding Officer Fitness Reports, looked at the MIPMDH position with disfavor, because it did not involve collecting or analyzing intelligence.  AR 47.

On June 30, 1997, LCDR Roberts received a second Officer Fitness Report from Capt. Bentz, with a "trait average" of 4.33 and a recommendation of "promotable."  AR 84-85. Therein, Capt. Bentz noted that the downgrade in LCDR Roberts's recommendation "in no way reflects a decline in her performance, but was the result of a change in the number of officers in the competitive category," even though her "summary group" was still comprised of 13 ONI Officers.  AR 85.

On September 19, 1997, the "baseline guide" published in ONIINST 1610.2 was revised as follows:

(a) Early Promote – 4.17 to 4.33;
(b) Must Promote – 3.83 to 4.17;
(c) Promotable – 2.67 to 3.83.

AR 109.

On October 31, 1997, LCDR Roberts received her first Officer Fitness Report from her new Reporting Senior, Capt. J. E. Darrah.  AR 256-57.  Capt. Darrah gave LCDR Roberts a "trait average" of 3.83 with a recommendation of "promotable." AR 257.  In addition, Capt. Darrah noted that LCDR Roberts's "lower trait average [w]as a result of [a] new reporting senior, not decreased performance."  AR 257.[4]  At this time, there were 16 officers in her "summary group." AR 257.

---

[4] LCDR Roberts contends that Capt. Bentz instructed Capt. Darrah to keep all officers at their last promotion recommendation during his initial reporting period.  AR 251.

On October 31, 1998, LCDR Roberts received a second Officer Fitness Report from Capt. Darrah, reporting a "trait average" of 4.00 and a recommendation of "must promote."  AR 31.  On February 23, 1999, LCDR Roberts received her last Officer Fitness Report from Capt. Darrah, reflecting a "trait average" of 4.00 and a recommendation of "early promote."  AR 31.

In 1999 and 2000, LCDR Roberts was assigned to the staff of the Commander of Naval Forces Korea, where she maintained a "trait average" above 4.33 and twice received a recommendation of "early promote."  AR 32.  During this period, the Commander of the Seventh Fleet filed a concurrent Officer Fitness Report for LCDR Roberts with a "trait average" of 4.50 and recommendation of "early promote."  AR 32.

In 2000, LCDR Roberts was assigned to the USS *Peleliu*, where she continued to receive "trait averages" in excess of 4.50 and recommendations of "early promote."  AR 32.  In May 2001, LCDR Roberts was eligible for promotion to Commander, but was not promoted.  AR 32.  In the fall of 2001, LCDR Roberts continued to serve on the USS *Peleliu*, which was assigned to support Operation Enduring Freedom in Afghanistan.  AR 32.  On November 28, 2001, now retired Capt. Bentz sent a letter recommending LCDR Roberts for promotion to Commander and stating that, at the time of her June 30, 1997 Officer Fitness Report, he was unfamiliar "with the long term impact of the subtle influences of the new fitness reporting system."  AR 49.  In May 2002, LCDR Roberts was promoted to Commander.  AR 32.  In October 2002, Commander ("CDR") Roberts transferred to the Joint Forces Intelligence Command.  AR 33.

On August 31, 2003, CDR Roberts received an Officer Fitness Report from Capt. W. F. Reiske at the Joint Forces Intelligence Command.  AR 33.  Therein, CDR Roberts received a "trait average" of 4.33 and a recommendation of "early promote."  AR 33.  On August 31, 2004, CDR Roberts received a second Officer Fitness Report from Capt. Reiske, receiving a "trait average" of 4.50 and a recommendation of "early promote."  AR 33.

On May 5, 2005, CDR Roberts received a final Officer Fitness Report from Capt. Reiske, prior to his retirement from the Navy.  AR 42-43.  Therein, she received a "trait average" of 4.67 and recommendation of "promotable."  AR 43.  The "trait average" for CDR Roberts's summary group of four officers was 4.75.  AR 43.  Two other ONI Officers received a recommendation of "promotable," one received "must promote," and one received "early promote."  AR 43.  Prior to the issuance of this Officer Fitness Report, Capt. Reiske advised CDR Roberts that, because a male officer in her summary group was up for promotion for the third time before the Commander Sea Screening Board, that officer was given a higher promotion recommendation to "help out a fellow officer."  AR 33.  CDR Roberts requested that a notation to that effect be made on her fitness report, but no notation was made.  AR 45.

In 2009 and 2010, CDR Roberts was considered by the Navy Intelligence Captain Selection Board for promotion to the rank of Captain.  AR 3.  On both occasions, her promotion was denied.  AR 3.

## II.    PROCEDURAL HISTORY.

### A.    Before the Board For Correction Of Naval Records.

On March 3, 1999, LCDR Roberts filed a Petition with the Board for Correction of Naval Records ("BCNR") requesting that the promotion recommendation from her June 30, 1997 Officer Fitness Report be changed from "promotable" to "must promote" and that the October 31, 1997 Officer Fitness Report be removed from her record.  On April 26, 1999, the BCNR sent a request to the Performance Evaluation Branch for an advisory opinion.  AR 656.  On June 29, 1999, the Performance Evaluation Branch issued an advisory opinion recommending that LCDR Roberts's Petition be denied.  AR 258.  On July 16, 1999, the BCNR sent LCDR Roberts a copy of the advisory opinion, and gave her 30 days to review and respond with any questions.  AR 654.  On September 13, 1999, LCDR Roberts responded and requested additional time to reply because of her deployment to the staff of Commander, Naval Forces Korea.  AR 260.  On October 25, 2000, the BCNR issued a Final Decision denying LCDR Roberts's March 3, 1999 Petition.  AR 230.

On October 14, 2008, CDR Roberts filed a second Petition at the BCNR, again requesting that the recommendations from the June 30, 1997 and October 31, 1997 Officer Fitness Reports be changed from "promotable" to "must promote," and also that the recommendation from her May 5, 2005 Officer Fitness Report be changed from "promotable" to "early promote."  AR 7, 29.  In addition, the BCNR was asked to convene a Special Board to reconsider the FY 2009 Intelligence Captain Selection Board's decision not to promote CDR Roberts to the rank of Captain.  AR 29.

On February 26, 2009, the BCNR requested that the Navy Equal Opportunity Office, the Navy's Office of Legal Counsel, and the Navy Personnel Command submit advisory opinions regarding CDR Roberts's October 14, 2008 Petition.  AR 135.  On April 3, 2009, the Navy Equal Opportunity Office submitted an advisory opinion recommending that CDR Roberts's October 14, 2008 Petition be denied.  AR 54.  On May 7, 2009, the Navy Personnel Command submitted an advisory opinion recommending that CDR Roberts's October 14, 2008 Petition be denied.  AR 57.  On June 10, 2009, the Navy Judge Advocate General's Corps also submitted an advisory opinion recommending that CDR Roberts's October 14, 2008 Petition be denied.  AR 61.  On September 10, 2009, counsel for CDR Roberts submitted a letter responding to each of these advisory opinions.  AR 70.

On September 17, 2009, the BCNR sent a request to the Navy's Officer Career Progression Branch for an advisory opinion regarding CDR Roberts's October 14, 2008 Petition. On October 7, 2009, the Officer Career Progression Branch issued an advisory opinion recommending that CDR Roberts's October 14, 2008 Petition be denied.  AR 74.  On November 16, 2009, counsel for CDR Roberts responded to this advisory opinion.  AR 75.  On December 22, 2009, the BCNR denied CDR Roberts's October 14, 2008 Petition.  AR 2.

### B.    Before the United States Court of Federal Claims.

On March 26, 2010, CDR Roberts filed a Complaint ("Compl.") in the United States Court of Federal Claims.  The March 26, 2010 Complaint alleges that the June 30, 1997, October

31, 1997, and May 5, 2005 Officer Fitness Reports were prepared improperly. Compl. ¶¶ 34, 39. The March 26, 2010 Complaint further alleges that the BCNR acted in an arbitrary and capricious manner in denying CDR Roberts's October 14, 2008 Petition regarding those reports, and as a result CDR Roberts was denied promotions to Commander and Captain that she should have received along with requisite pay and benefits (hereinafter, "back pay claims"). Compl. ¶¶ 34-44. In addition, the March 26, 2010 Complaint alleges that CDR Roberts had property and liberty interests in the pay and promotions that she should have received, and the Navy's actions regarding her Officer Fitness Reports deprived her of those interests in violation of the Due Process Clause of the Fifth Amendment to the United States Constitution. Compl. ¶¶ 45-46. The March 26, 2010 Complaint requests that the court void and set aside the June 30, 1997, October 31, 1997, and May 5, 2005 Officer Fitness Reports and direct the Navy to conduct a Special Selection Board to determine whether CDR Roberts should have been promoted to CDR after her May 2001 review, and later to Captain. Compl., Prayer For Relief ¶¶ 1-2. In the alternative, the March 26, 2010 Complaint requests pay and benefits for the years during which CDR Roberts should have been promoted. Compl., Prayer For Relief ¶ 3.

On July 9, 2010, the Government filed the Administrative Record and a Motion To Dismiss And, In The Alternative, For Judgment On The Administrative Record ("Gov't Mot."). On August 9, 2010, Plaintiff filed a Response to the Government's July 9, 2010 Motion and a Cross-Motion For Judgment On The Administrative Record ("Pl. Mot."). On September 3, 2010, the Government filed an Unopposed Motion For Extension Of Time that the court granted on September 7, 2010.

On September 30, 2010, the Government filed a Response and Reply to Plaintiff's August 9, 2010 Cross-Motion and Response ("Gov't Resp."). On October 11, 2010, Plaintiff filed an Unopposed Motion For Extension Of Time that the court granted on October 12, 2010. On November 15, 2010, Plaintiff filed a Reply ("Pl. Reply") to the Government's September 30, 2010 Response and Reply.

## III. DISCUSSION.

### A. Standing

The United States Supreme Court has held that "the question of standing is whether the litigant is entitled to have the court decide the merits of the dispute or of particular issues." *Warth* v. *Seldin*, 422 U.S. 490, 498 (1975). Standing must be determined "as of the commencement of suit." *Rothe Dev. Corp. v. Dep't of Def.*, 413 F.3d 1327, 1334 (Fed. Cir. 2005). The party invoking federal jurisdiction bears the burden of establishing standing. *See Lujan* v. *Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992). Specifically, "a plaintiff must show [that] it has suffered an 'injury in fact' that is . . . concrete and particularized and . . . actual or imminent, not conjectural or hypothetical; . . . the injury is fairly traceable to the challenged action of the defendant; and . . . it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Friends of the Earth, Inc.* v. *Laidlaw Envtl. Serv., Inc.*, 528 U.S. 167, 180-81 (2000) (internal citations omitted).

The March 26, 2010 Complaint alleges that CDR Roberts has suffered an injury in fact, that can be determined in a specific amount, and is traceable to the Navy depriving her of pay and benefits for the ranks of Commander and Captain as a result of the June 30, 1997, October 31, 1997, and May 5, 2005 Officer Fitness Reports. Compl. ¶ 34-44. CDR Roberts's alleged injury has resulted in economic injury sufficient to establish standing.

### B.      Jurisdiction.

The jurisdiction of the United States Court of Federal Claims is established by the Tucker Act. *See* 28 U.S.C. § 1491. The Act authorizes the court "to render judgment upon any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort." 28 U.S.C. § 1491(a)(1). The Tucker Act, however, is "a jurisdictional statute; it does not create any substantive right enforceable against the United States for money damages. . . . [T]he Act merely confers jurisdiction upon [the United States Court of Federal Claims] whenever the substantive right exists." *United States v. Testan*, 424 U.S. 392, 398 (1976). Therefore, a plaintiff must identify and plead an independent contractual relationship, constitutional provision, federal statute, or executive agency regulation that provides a substantive right to money damages. *See Fisher v. United States*, 402 F.3d 1167, 1172 (Fed. Cir. 2005) (en banc) ("The Tucker Act itself does not create a substantive cause of action; in order to come within the jurisdictional reach and the waiver of the Tucker Act, a plaintiff must identify a separate source of substantive law that creates the right to money damages."). The burden of establishing jurisdiction falls upon the plaintiff. *See FW/PBS, Inc.* v. *Dallas*, 493 U.S. 215, 231 (1990) (holding that the burden is on the plaintiff to allege facts sufficient to establish jurisdiction); *see also* RCFC 12(b)(1).

The March 26, 2010 Complaint alleges that the court has jurisdiction to adjudicate the claims in the March 26, 2010 Complaint under the Military Pay Act, 37 U.S.C. § 204 and the Fifth Amendment to the United States Constitution. Compl. ¶¶ 2, 46. Plaintiff's jurisdictional claims are further addressed below.

### C.      Standard For Decision On Motion To Dismiss.

A challenge to the United States Court of Federal Claims' "general power to adjudicate in specific areas of substantive law . . . is properly raised by a [Rule] 12(b)(1) motion. . . ." *Palmer* v. *United States*, 168 F.3d 1310, 1313 (Fed. Cir. 1999); *see also* RCFC 12(b)(1) ("Every defense, in law or fact, to a claim for relief in any pleading, whether a claim, counterclaim, or third-party claim, shall be asserted in the responsive pleading thereto if one is required, except that the following defenses may at the option of the pleader be made by motion: (1) lack of jurisdiction over the subject matter. . . ."). When considering whether to dismiss an action for lack of subject matter jurisdiction, the court is "obligated to assume all factual allegations to be true and to draw all reasonable inferences in plaintiff's favor." *Henke* v. *United States*, 60 F.3d 795, 797 (Fed. Cir. 1995). Nonetheless, the plaintiff bears the burden of establishing jurisdiction by a preponderance of the evidence. *See Reynolds* v. *Army & Air Force Exch. Serv.*, 846 F.2d 746, 748 (Fed. Cir. 1988) ("[O]nce the [trial] court's subject matter jurisdiction [is] put in

7

question . . . [the plaintiff] bears the burden of establishing subject matter jurisdiction by a preponderance of the evidence.").

**D.     The Government's July 9, 2010 Motion To Dismiss.**

**1.     The Government's Argument.**

The Government's argues that the March 26, 2010 Complaint should be dismissed, because: 1) the back pay claims alleged are not money-mandating; 2) the court is being asked to evaluate discretionary military personnel decisions, without proper tests or standards; 3) the claims alleged therein are barred by the doctrine of laches; and 4) Plaintiff does not have a protected property or liberty interest in a military promotion.

First, the Government argues that Plaintiff's back pay claims should be dismissed, because they do not arise out of a money mandating statute. Gov't Mot. at 10. The March 26, 2010 Complaint alleges that Plaintiff is owed back pay for two promotions that she did not receive: one in 2001; the other in 2009. Compl. ¶ 46. For claims premised upon a promotion not received, the Military Pay Act, 37 U.S.C. § 204, is not money-mandating. Gov't Mot. at 10.

In *Smith* v. *Secretary of the Army*, 384 F.3d 1288 (Fed. Cir. 2004), the United States Court of Appeals for the Federal Circuit recognized two exceptions to the general rule that the Military Pay Act is not money-mandating for claims premised upon a promotion not received: 1) where the plaintiff has a "clear cut legal entitlement" to the promotion; and, 2) "when the decision not to promote the service member leads to the service member's compelled discharge." *Id.* at 1294-95.

As to the first exception, the March 26, 2010 Complaint asks the court to order the Navy to convene a Special Selection Board to determine if Plaintiff should have been promoted to Commander in 2001 and to Captain either in 2009 or 2010. Compl., Prayer For Relief ¶ 2. Since Plaintiff's promotion is contingent on a prospective decision by a selection board that may never convene, Plaintiff does not have a "clear cut legal entitlement" to a promotion. Gov't Mot. at 10. In addition, because Plaintiff is still on active duty, she has no standing to challenge the denial of her promotion under the "compelled discharge" exception. Gov't Mot. at 10.

Second, Plaintiff's back pay claims concern discretionary military personnel decisions and, therefore, are non-justiciable. Gov't Mot. at 11. Neither party in this case asserts that Congress has established "tests and standards" to evaluate Plaintiff's Officer Fitness Reports. Gov't Mot. at 12; Pl. Mot. at 7. Nor does ONIINST 1610.2 rise to a "test or standard," as it only codifies the discretion of Reporting Seniors in making promotion recommendations. Gov't Mot. at 12. Apart from ONIINST 1610.2, Plaintiff fails to plead that the Navy or BCNR violated any other law or regulation. Gov't Mot. at 12.

Third, Plaintiff's claims are barred by the doctrine of laches. Gov't Mot. at 13. The Administrative Record does not evidence that Plaintiff's active duty assignment interfered with bringing suit. Gov't Mot. at 14. Therefore, Plaintiff should not be excused from the obligation to timely seek relief. *Id.* Plaintiff's delay in bringing this action in a timely manner will cause

undue prejudice to the Government. *Id.* Plaintiff's claims are based upon a conversation she had with Capt. Bentz thirteen years ago, as witnessed by Capt Kirkpatrick. *Id.* Although there are affidavits in the record attesting to this conversation, witnesses' memories have faded. *Id.*

Finally, as to Plaintiff's due process claim, the Government argues that "no constitutionally protected property or liberty interest in a military promotion exists." Gov't Mot. at 22 (citation omitted). Even if Plaintiff did have a property or liberty interest in a promotion and pay, she was afforded appropriate due process through her appeal to the BCNR. *Id.* at 22-23. Since Plaintiff has not met her burden to show material error by the BCNR, she cannot establish that the BCNR acted in an arbitrary and capricious manner in denying her Petitions. *Id.* at 23. Therefore, "[i]nsofar as [Plaintiff] relies upon the Fifth Amendment Due Process clause, her claim is unsupportable and should be dismissed." *Id.*

## 2.    Plaintiff's Response.

Plaintiff responds that her claims are money-mandating because they fit within the recognized exceptions from *Smith*. Pl. Mot. at 10. For example, Plaintiff has a "clear cut legal entitlement" to the promotions cited, because she satisfied all requirements to be eligible for promotion by the Selection Boards in 2001, 2009, and 2010. *Id.* Instead, the Selection Boards based their decisions on incomplete and misleading Officer Fitness Reports. *Id.* Therefore, this court has jurisdiction to decide whether those decisions were lawful. *Id.* at 12.

In addition, Plaintiff argues that as a result of not being promoted to Captain, she no longer has tenure protection and is eligible for discharge. Pl. Mot. at 11. Therefore, the claims alleged in the March 26, 2010 Complaint are ripe, because Plaintiff faces potential unfair discharge. Pl. Reply at 3. In the alternative, Plaintiff requests that if this Court finds her claims unripe and not money-mandating under the Military Pay Act, this case be transferred to the United States District Court for the District of Columbia, "where the matter is ripe for review under the Administrative Procedures Act." *Id.*

Plaintiff also argues that to survive a motion to dismiss, a complaint need only identify a money-mandating statute. Pl. Reply at 2. The March 26, 2010 Complaint identifies the Military Pay Act as the relevant money-mandating statute, and it is well settled that the Military Pay Act is a money-mandating statute. *Id.* Therefore, the court has jurisdiction to adjudicate the claims alleged in the March 26, 2011 Complaint. *Id.*

Next, Plaintiff responds that the Navy violated ONIINST 1610.2 in preparing of her June 30, 1997, October 31, 1997, and May 5, 2005 Officer Fitness Reports. Pl. Reply at 1. In addition, Plaintiff's May 5, 2005 Officer Fitness Report was the result of sex-based discrimination in violation of Department of Defense Directive 1350.2. Pl. Mot. at 30. Further, the October 25, 2000, and December 22, 2009 decisions of the BCNR were arbitrary and capricious in violation of 10 U.S.C. § 1552. Pl. Mot. at 8-9. As such, these statutes and regulations provide the court with sufficient guidance to evaluate the actions of the Navy and BCNR. Pl. Reply at 1.

As to the Government's laches argument, Plaintiff responds that her claims should not be barred, because the delay in bringing this suit is excusable.  Pl. Mot. at 12-13.  Plaintiff's claim accrued in May 2001, when the first selection board declined to promote her to the rank of Commander, thereby depriving her of the pay of a Commander until May 2002.  Pl. Mot. at 12. At the time of the May 2001 Selection Board Decision, Plaintiff was serving aboard the USS *Peleliu*, and was deployed that fall in support of Operation Enduring Freedom in Afghanistan. Pl. Mot. at 12.  Thereafter, she served with the Joint Forces Intelligence Command and was subsequently deployed to Iraq.  AR 33.  She did not return to the United States until July 2005 to attend War College, at which time she sought legal assistance.  AR 824.  Plaintiff's counsel, based in Slidell, Louisiana, was hampered by the effects of Hurricane Katrina in August 2005, and was not able to interview Plaintiff until she was re-assigned to ONI on August 22, 2008.  Pl. Mot. at 13.  On October 14, 2008, Plaintiff petitioned the BCNR.  AR 7.  Therefore, Plaintiff's delay in bringing this claim is excusable as a result of her deployment in two major armed conflicts and the effects of Hurricane Katrina.  Pl. Mot. at 13.

Irrespective of Plaintiff's inability to seek counsel and petition the BCNR until October 14, 2008, the Administrative Record contains no evidence of undue prejudice to the Government. Pl. Mot. at 14.  The Government has not argued that evidence was destroyed or that memories have in fact faded, it only argues that memories *may* have faded.  Pl. Mot. at 14.  In fact, the Government did not even seek to question Capt. Bentz or Capt. Kirkpatrick prior to filing the July 9, 2010 Motion To Dismiss.  Pl. Reply at 5.  All of the potential witnesses remain available for questioning.  Pl. Mot. at 14.

Finally, Plaintiff has "both a property and liberty interest in her career," "a property interest in the increased pay that she earned were it not for the improper and illegal fitness reports," and an entitlement to fair consideration by the promotion selection boards.  Pl. Mot. at 23.

### 3.      The Government's Reply.

The Government replies that Plaintiff's claims are not money-mandating.  Gov't Resp. at 2-3.  CDR Roberts's "Selection Board eligibility" does not constitute a "clear cut legal entitlement" to a promotion, a pre-requisite for alleging a money-mandating claim.  *Id*. at 3.  In addition, because CDR Roberts is still on active duty and has not been discharged, her claim for lack of tenure protection is unripe.  *Id*. at 4.

The Government continues to argue that Plaintiff's claims should be barred by laches, because her claims accrued by March 3, 1999, the date she first petitioned the BCNR.  Gov't Resp. at 7.  Plaintiff then failed to petition this court after her petition was rejected on October 25, 2000, despite the fact that she was not deployed to Afghanistan for another year.  *Id*.

Finally, the Government argues that Plaintiff has failed to state a due process claim because she was "neither dismissed from employment nor prevented from pursuing her chosen profession when she was not selected for a competitive promotion."  Gov't Resp. at 15.  Plaintiff exercised her right to view her record and appeal to the BCNR, and had full opportunity to review and respond to advisory opinions submitted to the BCNR.  *Id*.  Plaintiff's BCNR petitions

were denied due to her failure to provide "cogent and convincing evidence as to a material error" by her reporting seniors, not because of arbitrary and capricious actions by the BCNR.  *Id*. at 15-16.

### 4.      The Court's Resolution.

#### a.      Plaintiff's Claims For Back Pay And Promotion Benefits.

Under the Tucker Act, the United States Court of Federal Claims "may, as an incident of and collateral to any [judgment rendered by the court], issue orders directing restoration to office or position, placement in appropriate duty or retirement status, and correction of applicable records, and such orders may be issued to any appropriate official of the United States."   28 U.S.C. § 1491(a)(2).   In *Smith* v. *Secretary of the Army*, 384 F.3d 1288, 1294 (Fed. Cir. 2004), the United States Court of Appeals for the Federal Circuit held that "the [United States] Court of Federal Claims can offer a service member . . . an adequate remedy for a claim relating to military status . . . if [1] the service member's claim constitutes a request for money (together with a request for ancillary equitable relief) and [2] if the request is based on a money-mandating statute, such as the Military Pay Act."  *Id*. at 1293.

#### i.      Request For Money.

The March 26, 2010 Complaint requests that Plaintiff's June 30, 1997, October 31, 1997, and May 5, 2005 Officer Fitness Reports be corrected and/or removed from her record and the Navy be directed to "conduct special selection boards to ascertain whether she should have been promoted to Commander (O-5) on her first review and to Captain (O-6).  Compl., Prayer for Relief ¶¶ 1-2.  In the alternative, the March 26, 2010 Complaint seeks "pay and benefits for the years [P]laintiff should have been promoted."  Compl., Prayer for Relief ¶ 3.

Although the March 26, 2010 Complaint does not seek monetary damages as a primary remedy, the United States Court of Appeals for the Federal Circuit has held that a plaintiff's primary motivation in seeking relief at the United States Court of Federal Claims may be ancillary to the plaintiff's claim for monetary damages.  *See Holley* v. *United States*, 124 F.3d 1462, 1466 (Fed. Cir. 1997) ("Even were the clearing of his name his primary motivation, [plaintiff] can not be barred from access to the [United States] Court of Federal Claims upon stating a claim for monetary damages and ancillary relief that includes correcting his military records.").  Therefore, the court has determined that the March 26, 2010 Complaint alleges a claim requesting money.

#### ii.      Money-Mandating Statute.

The United States Court of Appeals for the Federal Circuit also repeatedly has held that the Military Pay Act is a money mandating statute.  *See Smith*, 384 F.3d at 1294; *see also Dysart* v. *United States*, 369 F.3d 1303, 1315 (Fed. Cir. 2004) ("[T]he Military Pay Act . . . provides for suit in the [United States] Court of Federal Claims when the military, in violation of the Constitution, a statute, or a regulation, has denied military pay."); *Holley*, 124 F.3d at 1465 ("It is well established that [the Military Pay Act] serves as the money-mandating

statute applicable to military personnel claiming damages and ancillary relief for wrongful discharge."). The relevant inquiry, however, is "whether the Military Pay Act [can] provide a monetary remedy under the circumstances of this case." *Smith*, 384 F.3d at 1294.

In *United States* v. *Testan*, 424 U.S. 392 (1976), the United States Supreme Court held that "[t]he established rule is that one is not entitled to the benefit of a position until he has been duly appointed to it." *Id*. at 402 (citations omitted). Therefore, "in a challenge to a decision not to promote, the Military Pay Act (ordinarily) does not give rise to a right to the pay of the higher rank for which the plaintiff was not selected." *Smith*, 384 F.3d at 1294; *see also Knightly* v. *United States*, 227 Ct. Cl. 767, 769 (Ct. Cl. 1981) ("We do not have jurisdiction of a back pay claim predicated on a promotion not received.")).

The United States Court of Appeals for the Federal Circuit, however, has recognized two exceptions to this general rule:

> Under the first exception, an action for money arises under the Military Pay Act in the unusual case in which, on the plaintiff's legal theory, there is a clear-cut legal entitlement to the promotion in question, . . . i.e., he has satisfied all the legal requirements for promotion, but the military has refused to recognize his status. Under the second exception, an action for money arises under the Military Pay Act when the decision not to promote the service member leads to the service member's compelled discharge. If, in such a case, the effect of an order voiding the nonpromotion decision would be to give the service member a right to continue in the service at his previous rank, he would have a claim for the pay lost because of his improper separation.

*Smith*, 384 F.3d at 1294-95 (internal citations and quotations omitted).

As to the first exception, the March 26, 2010 Complaint does not allege that Plaintiff has a "clear-cut legal entitlement to the promotion in question," but only that the BCNR's decision not to remove Plaintiff's Officer Fitness Reports from her record was "arbitrary and capricious, not supported by substantial evidence, and in violation of the Constitution, statutes . . . and regulations of the United States." Compl. ¶¶ 35, 40. The March 26, 2010 Complaint does not allege that Plaintiff would have been promoted but for those fitness reports. *Id*. The March 26, 2010 Complaint only requests that the court "[d]irect the Navy to conduct special selection boards to ascertain *whether* [*Plaintiff*] *should have been promoted*. . . ." Compl., Prayer For Relief ¶ 2 (emphasis added). Even if the court were to grant Plaintiff all of the relief she seeks, another selection board would have to review Plaintiff's service records and determine whether she should have been promoted.

Likewise, Plaintiff's reliance upon *Skinner* v. *United States*, 594 F.2d 824 (Ct. Cl. 1979), to argue that CDR Roberts had a "clear cut legal entitlement" to her promotions is misplaced, since the plaintiff in that case was involuntarily discharged as a result of not being promoted. *Id*. at 826. The court in *Skinner* did not determine whether the plaintiff had a "clear cut legal entitlement" to a promotion because the fact that plaintiff was discharged was sufficient for jurisdiction to lie. *Id.* at 831.

Therefore, the court has determined that, as of this date, Plaintiff has not "satisfied all the legal requirements for promotion[.]"  *Smith*, 384 F.3d at 1294; *see also Driscoll v. United States*, 67 Fed. Cl. 22, 26-27 (2005) (finding no "clear cut entitlement" to a promotion under *Smith* where an active duty service member "simply alleges that he was denied [a] promotion for which he was *eligible*, not [a] promotion for which he was *entitled* . . .").

Regarding the second exception, the Military Pay Act affords a discharged officer "a claim for the pay lost because of his improper separation."  *Smith*, 384 F.3d at 1295.  For this "exception to apply, a service member's discharge must be involuntary."  *Id*.  In addition, "the relief that is sought and that the court is empowered to grant . . . must result in rendering the service member's discharge improper, thus entitling the service member to a monetary remedy."  *Id*.  In this case, Plaintiff is an active duty officer in the United States Navy, and the March 26, 2010 Complaint does not allege that she has been involuntarily discharged.  Therefore, the second exception is not relevant.  Plaintiff's argument that she is "on the cusp of involuntary discharge/retirement" is unavailing.  Pl. Mot. at 12.  Plaintiff has not lost any pay due to an improper separation, nor has she been unlawfully discharged.

Accordingly, the court has determined that the back pay claims alleged in the March 26, 2010 Complaint are not money-mandating, and the court does not have jurisdiction to adjudicate these claims.  *See Bannum, Inc. v. United States*, 56 Fed. Cl. 453, 462 (2003) (holding that a court may not exercise jurisdiction over an unripe claim since it is "premised upon contingent future events that may not occur as anticipated, or indeed may not occur at all"); *see also* RCFC 12(b)(1).

> **b.      Plaintiff's Claims For Back Pay And Benefits For Promotions Not Received Are Not Barred By Laches.**

Assuming, *arguendo*, that the court had jurisdiction over Plaintiff's back pay claims, the Government has raised an affirmative defense of laches.  Gov't Mot. at 13.  Laches requires that the defendant establish that plaintiff's delay in bringing suit was "unreasonable and unexcused," and will result in prejudice.  *See Cornetta* v. *United States*, 851 F.2d 1372, 1378-80 (Fed. Cir. 1988) ("If the government invokes the affirmative defense of laches, it has the burden to show that it was prejudiced by a claimant's tardiness in filing suit.").

> **i.      Unreasonable Delay.**

Whether a delay is unreasonable and unexcused is determined by balancing the length of the delay against the underlying reasons for the delay.  *See Pepper* v. *United States*, 794 F.2d 1571, 1573-74 (Fed. Cir. 1986) (affirming a finding of inexcusable delay where a serviceman waited 4 years to challenge fitness reports, despite having been passed over for promotion five times as a result of the challenged reports).  The length of a plaintiff's delay relating to a claim for an improper fitness report is measured from the date a claim accrued.  *See Adkins* v. *United States*, 228 Ct. Cl. 909, 911 (Ct. Cl. 1981) (holding that the issuance of the challenged fitness report put a plaintiff "on notice of his claim" for purposes of laches); *see also Pepper*, 794 F.2d at 1573 (A fitness report "must be challenged within a reasonable time after it is issued.").

13

In this case, Plaintiff was on notice that she had a claim regarding the June 30, 1997 and October 31, 1997 Officer Fitness Reports for almost thirteen years before she filed a Complaint in this court. On October 25, 2000, Plaintiff's March 3, 1999 Petition regarding her June 30, 1997 and October 31, 1997 Officer Fitness Reports was denied. AR 230. Plaintiff explains that the delay in bringing an action was due to her deployment from the fall of 2001 until the summer of 2005 in Afghanistan and Iraq, and disruption to her counsel's practice caused by the aftermath of Hurricane Katrina. Pl. Mot. at 12-13. Active duty military service, however, does not excuse the obligation to file grievances on a timely basis. *See Deering* v. *United States*, 620 F.2d 242, 245 (Ct. Cl. 1980) ("The need to protect [military personnel] from unwavering statutes of limitations is self-evident. . . . However, we can see no corresponding need to protect military personnel statutorily from the doctrine of laches."). Moreover, in this case, Plaintiff was not actively engaged in hostilities throughout this entire period.

On October 14, 2008, Plaintiff filed a second Petition with the BCNR, requesting re-examination of the June 30, 1997 and October 31, 1997 Officer Fitness Reports on the basis of new evidence, *i.e.*, letters from Capt. Bentz, dated November 28, 2001 and June 3, 2004. This new evidence indicates that Plaintiff had notice of the opportunity to challenge the BCNR's October 25, 2000 decision as early as November 28, 2001. AR 49-50. Therefore, the court has determined that Plaintiff's delay in pursuing her claims related to the June 30, 1997 and October 31, 1997 Officer Fitness Reports was unreasonable.

As to the May 5, 2005 Officer Fitness Report, Plaintiff timely filed a Petition with the BCNR on October 14, 2008 that was denied on December 22, 2009, just three months before she filed a Complaint at the United States Court of Federal Claims. AR 2, 7. Therefore, the court has determined that Plaintiff's delay in asserting claims related to the May 5, 2005 Officer Fitness Report was not unreasonable.

### ii.    Prejudice.

The United States Court of Appeals for the Federal Circuit has held that "[i]f the government invokes the affirmative defense of laches, it has the burden to show that it was prejudiced by a claimant's tardiness in filing suit. Prejudice may not be presumed from the length of a claimant's delay." *Cornetta*, 851 F.2d at 1380. Prejudice occurs in two contexts: defense prejudice or economic prejudice. *Id*. at 1378. Defense prejudice may be shown through a "loss of records, destruction of evidence, fading memories, or unavailability of witnesses." *Id*. Economic prejudice is established by showing that a plaintiff's unreasonable or unexcused delay has substantially increased the amount of money damages potentially owed her. *Id*. at 1382. However, "the potential recovery of an amount of back pay equal to the amount that would accrue for the time it would take to establish entitlement is not an element of prejudice to the government no matter when suit is brought." *Id*.

Addressing defense prejudice first, the Government argues that, because of Plaintiff's delay, witness memories, specifically those of Captains Bentz and Kirkpatrick, may have faded. Gov't Mot. at 14; *see also Cornetta*, 851 F.2d at 1378. But, as Plaintiff noted, the Administrative Record includes statements from Captains Bentz and Kirkpatrick, and the

Government did not re-interview them in support of the July 9, 2010 Motion To Dismiss. Pl. Mot. at 14; Pl. Reply at 5. Having failed to proffer specific evidence, beyond speculation, the Government has not met its burden to establish prejudice.

Regarding economic prejudice, the salary difference between a Commander and Lieutenant Commander in 2001 does not constitute economic prejudice. *See Cornetta*, 851 F.2d at 1382. In addition, Plaintiff's claim for back pay for the rank of Captain is part of "the amount that would accrue for the time it would take to establish entitlement," and does not constitute economic prejudice. *Id.* Plaintiff timely filed a Petition at the BCNR after the 2009 Intelligence Captain Selection Board issued its decision not to promote her to captain. AR 2, 7. Finally, the cost of administering a selection board is not relevant to determining economic prejudice to the Government.

Therefore, the court has determined that the claims for back pay and promotion, alleged in the March 26, 2010 Complaint, are not barred by laches.

### c. The United States Court Of Federal Claims Does Not Have Jurisdiction To Adjudicate Due Process Claims.

The March 26, 2010 Complaint also alleges that the Government "deprived [P]laintiff of monetary benefits including pay and allowances in violation of the due process clause of the Fifth Amendment to the United States Constitution." Compl. ¶ 46. The United States Court of Appeals for the Federal Circuit, however, has long held that this court does not have jurisdiction to adjudicate claims arising under the due process clause of the Fifth Amendment to the United States Constitution because they are not money-mandating. *See Crocker v. United States*, 125 F.3d 1475, 1476 (Fed. Cir. 1997) ("The Court of Federal Claims . . . does not have jurisdiction to hear [Plaintiff's] due process . . . claims under the Fifth Amendment to the United States Constitution."); *see also LeBlanc* v. *United States*, 50 F.3d 1025, 1028 (Fed. Cir. 1995) ("[Plaintiff's] complaint [alleged] violation of his rights under the Due Process Clauses of the Fifth and Fourteenth Amendments. . . . [This is not] a sufficient basis for jurisdiction because they do not mandate payment of money by the government."); *Mullenberg* v. *United States*, 857 F.2d 770, 773 (Fed. Cir. 1988) (same).

Therefore, the court has determined that it does not have jurisdiction to adjudicate the due process claim alleged in the March 26, 2010 Complaint. *See* RCFC 12(b)(1).

### E.     Transfer To The United States District Court For The District Of Columbia.

Plaintiff requests that if "this [c]ourt finds that it lacks jurisdiction . . . that the matter be transferred to the United States District Court for the District of Columbia instead of being dismissed." Pl. Reply at 15. Section 1631 of Title 28 of the United States Code provides:

> Whenever a civil action is filed in a court[,] . . . and that court finds that there is a want of jurisdiction, the court shall, if it is in the interest of justice, transfer such action or appeal to any other such court in which the action or appeal could have been brought at the time it was filed or noticed[.]

28 U.S.C. § 1631.

The United States Court of Appeals for the Federal Circuit has provided that 28 U.S.C. § 1631 "requires the transferor court to determine both that it lacks jurisdiction and that the transferee court possesses jurisdiction." *Fisherman's Harvest, Inc.* v. *PBS & J*, 490 F.3d 1371, 1374 (Fed. Cir. 2007). The transfer of a case must also be "in the interest of justice." 28 U.S.C. § 1631; *see also Reilly* v. *United States*, 93 Fed. Cl. 643, 650 (2010) ("If those requirements are met, the court must then determine whether the transfer is in the interest of justice.") (citations and quotation marks omitted).

As previously discussed, the court has determined that it does not have jurisdiction to adjudicate the claims alleged in the March 26, 2010 Complaint.

The United States Supreme Court has held that BCNR decisions "are subject to judicial review and can be set aside if they are arbitrary, capricious or not based on substantial evidence." *Chappell* v. *Wallace*, 462 U.S. 296, 303 (1983) (citations omitted); *see also Cone* v. *Caldera*, 223 F.3d 789, 793 (D.C. Cir. 2000) ("Although we have jurisdiction to review the decisions of the Correction Board, we do so under an unusually deferential application of the arbitrary or capricious standard of the Administrative Procedure Act."[5]) (quotation marks and citation omitted). Although this court does not have jurisdiction to adjudicate Plaintiff's APA and gender discrimination claims, the United States District Court for the District of Columbia does and is the proper forum for bringing this action. *See* 28 U.S.C. § 1391(e)(1)[6]; *see also Texas Peanut Farmers* v. *United States*, 409 F.3d 1370, 1375 (Fed. Cir. 2005) (holding that 28 U.S.C. § 1631 requires that "transfer be considered to cure jurisdictional defects"); *American Beef Packers, Inc.* v. *Interstate Commerce Comm'n*, 711 F.2d 388, 390 (D.C. Cir. 1983) (holding that 28 U.S.C. § 1631 is to "aid litigants who [are] confused about the proper forum for review.").

Therefore, the court has determined that the interests of justice will be served by transferring Plaintiff's claims for back pay and promotion, as alleged in the March 26, 2010 Complaint, to the United States District Court for the District of Columbia.

---

[5] The Administrative Procedure Act ("APA") is codified at 5 U.S.C. §§ 702-706.

[6] 28 U.S.C. § 1391(e)(1) provides, in relevant part:

A civil action in which a defendant is an officer or employee of the United States or any agency thereof acting in his official capacity or under color of legal authority, or an agency of the United States, or the United States, may, except as otherwise provided by law, be brought in any judicial district in which . . . a defendant in the action resides. . . .

28 U.S.C. § 1391(e)(1).

**IV.     CONCLUSION.**

For the reasons stated herein, the Clerk of the Court for the United States Court of Federal Claims is directed to transfer this action to the United States District Court for the District of Columbia.

**IT IS SO ORDERED.**

__s/Susan G. Braden__
**SUSAN G. BRADEN**
**Judge**

17